# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 8
The People &c.,
        Respondent,
        v.
Nathaniel Boone,
        Appellant.
----------------
No. 9
The People &c.,
        Respondent,
        v.
Albert Cotto,
        Appellant.

Case No. 8:

Nicole P. Geoglis, for appellant.
Shane A. Magnetti, for respondent.

Case No. 9:

Natalie Rea, for appellant.
Shane A. Magnetti, for respondent.
Kelly M. Socia et al., amici curiae.

CURRAN, J.:

The Sex Offender Registration Act (SORA) (Correction Law § 168 *et seq.*) provides that a sex offender "shall" be classified into one of three risk level categories "[30] days prior to discharge, parole or release" (Correction Law § 168-n [2]). The central question presented by these appeals is whether, for purposes of SORA, this deadline is properly

measured from the date an offender is released from confinement by the Department of Corrections and Community Supervision (DOCCS), despite pending or contemplated proceedings to civilly commit the offender under the Sex Offender Management and Treatment Act (SOMTA) (Mental Hygiene Law § 10.01 *et seq.*).  We hold that, under a plain reading of SORA, the 30-day deadline for conducting a risk level classification hearing must be measured from an offender's release by DOCCS upon the completion of a prison sentence, irrespective of whether the state is considering instituting, or has already instituted, proceedings under SOMTA.  We further hold that offenders are not denied due process by having a SORA hearing at a time when they may be civilly committed under SOMTA.

I.

People v Boone

In March 2011, defendant Boone pleaded guilty to three counts of course of sexual conduct against a child in the first degree (Penal Law § 130.75 [1] [a]) and one count of course of sexual conduct against a child in the second degree (§ 130.80 [1] [a]).  As their babysitter, Boone repeatedly raped and sexually abused four children under the age of 10, one of whom was his godchild.  He was previously twice convicted of sexual abuse, including an attempted rape of a six-year-old child, and was previously adjudicated a level two offender under SORA.  Boone was sentenced to concurrent 12-year prison terms, with 20 years postrelease supervision.  DOCCS received Boone into custody in April 2011, and had his conditional release date scheduled for September 10, 2019.

In advance of Boone's conditional release date, the Board of Examiners of Sex Offenders (Board) issued a risk assessment instrument (RAI) determining that Boone was a presumptive level three risk based on a points assessment and upon the application of an automatic override based on Boone's prior felony sex crime convictions. Before the SORA hearing was held, the Office of the Attorney General (Attorney General) filed a petition to civilly commit Boone pursuant to SOMTA. When Boone was released from confinement by DOCCS on his conditional release date, he was placed directly into the custody of the Office of Mental Health (OMH).[1] In short, the SOMTA proceedings against Boone were pending simultaneously with the SORA proceedings.

In the SORA proceedings, Boone opposed the Board's recommendation that he be adjudicated a level three sexually violent offender. He argued that a SORA hearing was premature and that the matter should be dismissed, or at the very least adjourned, because the pending SOMTA proceedings meant that his release to the community was no longer imminent. Boone also argued that conducting the SORA hearing despite pending SOMTA proceedings violated his right to due process because he was not permitted to challenge his SORA risk assessment at a meaningful time—i.e., when he would actually be released into the community. Alternatively, Boone requested that the court grant him a downward

---

[1] DOCCS's incarcerated lookup website reflects that, according to that agency, Boone has been "discharged" and was "release[d] to another agency" (Incarcerated Lookup, https://nysdoccslookup.doccs.ny.gov/ [search by last name "Boone" and first name "Nathaniel," click on 2011 DIN number]).

departure to risk level two.  He did not, however, challenge the points assessment under the RAI or the application of the automatic override.

After conducting a hearing, Supreme Court rejected Boone's arguments that the SORA hearing was premature due to the pending SOMTA proceedings and declined to exercise its discretion to either dismiss or adjourn the SORA proceedings.  The court held that SOMTA did not bar a SORA risk level classification hearing, it only postponed the offender's duty to register.  The court adjudicated Boone a level three sexually violent offender, based on both a points assessment and the automatic override that applied due to his prior felony sex crime convictions.  It denied the application for a downward departure. The Appellate Division affirmed, rejecting, inter alia, Boone's argument that the SORA proceedings were premature due to the pending SOMTA proceedings (202 AD3d 449 [1st Dept 2022]).  This Court granted defendant leave to appeal (38 NY3d 908 [2022]), and we now affirm.

People v Cotto

In June 2006, defendant Cotto pleaded guilty to sexual abuse in the first degree (Penal Law § 130.65 [3]) based on allegations that he raped a nine-year-old child he was babysitting.  This incident occurred less than three months after Cotto was released from incarceration for a prior felony sex offense:  the rape of a seven-year-old relative.  Cotto was sentenced to a determinate 10-year prison term with five years postrelease supervision. DOCCS received Cotto into custody in September 2006, and ultimately planned to release him on his maximum custodial date—February 29, 2016.  In anticipation of that date, the Board prepared an RAI determining that Cotto was presumptively a level three sexually

violent offender based on a points assessment[2] and the automatic override for Cotto's prior felony sex crime conviction.

On January 14, 2016, DOCCS, as the agency with jurisdiction, sent Cotto a letter informing him that he had been identified as a possible "detained sex offender" and, therefore, his case had been referred to a case review team to ascertain whether, under SOMTA, he required civil management, such as civil confinement, upon his release from prison (*see generally* Mental Hygiene Law §§ 10.03 [a]; 10.05).  Among other things, DOCCS informed Cotto that, during the review process, he "may be referred for a psychiatric examination and potentially for further proceedings in accordance with [SOMTA]."  It also indicated that the case review team could either determine that Cotto did not require civil management or, if it reached a contrary conclusion, it could refer the case to the Attorney General, who may elect to file a petition for civil management (§§ 10.05 [g]; 10.06 [a]).  DOCCS also informed Cotto of the potential outcomes of a petition for civil management under SOMTA—i.e., discharge, strict and intensive supervision in the community, or civil confinement (§§ 10.09-10.11).

During the SORA proceedings, Cotto argued that a SORA hearing was premature due to the possibility that he would be civilly confined under SOMTA.  He requested an

---

[2] Some of the points assessed against Cotto were based on his failure to participate in sex offender treatment and his continued sexual misconduct while incarcerated.

adjournment until he was about to be released into the community.[3]  Cotto also argued that holding a SORA hearing at this time, "when there is a not insignificant probability that [Cotto] will be released directly from DOCCS to OMH," violated his right to due process. Alternatively, Cotto requested a downward departure to risk level two.  Cotto did not challenge the points assessment under the RAI or the application of the automatic override.

Supreme Court rejected Cotto's request to adjourn or dismiss the SORA proceedings, determining that there was no legal basis to postpone in light of the mere possibility that Cotto would be civilly committed under SOMTA.[4]  Following the SORA hearing, the court adjudicated Cotto a level three sexually violent offender based on the Board's point assessment and the automatic override that applied due to his prior felony sex crime conviction.  The Appellate Division affirmed, rejecting, inter alia, Cotto's arguments that the SORA hearing should be adjourned pending the SOMTA proceedings, and that the timing of the SORA adjudication violated due process (203 AD3d 492 [1st Dept 2022]).  This Court granted leave to appeal (38 NY3d 1165 [2022]), and we now affirm.

II.

---

[3] To the extent that Cotto now contends on appeal that the court should have granted an adjournment pending the result of the case review team's psychological examination, that contention is unpreserved.

[4] According to the DOCCS incarcerated lookup website, Cotto is listed as being released to another agency on March 14, 2018 (Incarcerated Lookup, https://nysdoccslookup.doccs.ny.gov/ [search by last name "Cotto" and first name "Albert," click on 2006 DIN number]).

A.

Defendants contend that an offender is released for purposes of SORA, thereby triggering the need for a risk level classification hearing (*see* Correction Law § 168-n [3]), *only* when they are free from state-imposed confinement and certain to reenter the community. They suggest that a SORA risk level classification hearing cannot go forward if there is *any* possibility at the time of the hearing that the offender will remain confined by the state for more than 30 days—here due to the pendency (or possible pendency) of SOMTA proceedings that could result in civil commitment. We reject that contention and conclude that sex offenders are "released" for purposes of SORA at the time they are no longer confined by DOCCS following the completion of their prison sentence, regardless of the possibility that they may be confined under SOMTA. At the time of their SORA hearings, defendants had either been released or were about to be released from confinement by DOCCS and therefore the hearings were not premature. Defendants' proposed construction of the term "release" is not supported by the text and structure of SORA and would render SORA practically unworkable in cases involving the highest risk offenders.

B.

In interpreting a statute, it is "fundamental that a court . . . should attempt to effectuate the intent of the Legislature" (*Patrolmen's Benevolent Assn. of City of N.Y. v City of New York*, 41 NY2d 205, 208 [1976]; *see People v Roberts*, 31 NY3d 406, 418 [2018]). "[T]he clearest indicator of legislative intent is the statutory text," and we therefore start with the plain meaning of the language itself (*see Majewski v Broadalbin-*

*Perth Cent. School Dist.*, 91 NY2d 577, 583 [1998]).  "[E]ffect and meaning must, if possible, be given to the entire statute and every part and word thereof" (McKinney's Cons Laws of NY, Book 1, Statutes § 98 [a]; *see People v Talluto*, 39 NY3d 306, 311 [2022]). Furthermore, "[a] statute or legislative act is to be construed as a whole, and all parts of an act are to be read and construed together to determine the legislative intent" (McKinney's Cons Laws of NY, Book 1, Statutes § 97; *see People v Mobil Oil Corp.*, 48 NY2d 192, 199 [1979]).  "[W]here the language of a statute is clear and unambiguous, courts must give effect to its plain meaning" (*State of New York v Patricia II.*, 6 NY3d 160, 162 [2006] [internal quotation marks omitted]; *see Matter of Anonymous v Molik*, 32 NY3d 30, 37 [2018]).

SORA provides, as relevant to these defendants, that "[a] determination that an offender is a sexual predator, sexually violent offender, or predicate sex offender . . . *shall* be made prior to the discharge, parole, release to post-release supervision or release of such offender by the sentencing court applying the guidelines established by" Correction Law § 168-l "after receiving a recommendation from the [B]oard" (Correction Law § 168-n [1] [emphasis added]).  At the same time, "the sentencing court *shall* also make a determination with respect to the level of notification, after receiving a recommendation from the [B]oard" (§ 168-n [2] [emphasis added]).  Both judicial determinations must be made 30 days prior to an offender's release (*see id.*).  "As prescribed by [SORA], when a[n] [offender] is about to be *released from incarceration*, the original sentencing court has the responsibility to" perform the functions outlined in Correction Law § 168-n (*People v Stevens*, 91 NY2d 270, 272 [1998] [emphasis added]).  SORA's detailed commands govern

the procedure and timeline under which an offender's risk level classification and registration must occur (*see id.* at 279).

As relevant to these appeals, this entire process is triggered by, and consistently tied to an offender's "release" (*see* Correction Law § 168-m; *see also* §§ 168-l [6], 168-n [2]). Although SORA does not expressly define the term "release" (*see generally* § 168-a), a comprehensive reading of the statute makes clear that the legislature intended the term primarily to refer to an offender's release from confinement by DOCCS.

"[I]t is a bedrock rule of statutory construction that, where the same word or phrase is used in different parts of a statute[,] it will be presumed to be used in the same sense throughout, absent any indication of a contrary intent" (*Matter of Mental Hygiene Legal Serv. v Sullivan*, 32 NY3d 652, 659 [2019] [internal quotation marks omitted]; *see* McKinney's Cons Laws of NY, Book 1, Statutes § 236). To that end, multiple SORA provisions expressly tie the concept of "release" to an offender's departure from *any of several* expressly listed locations, including—first and foremost—a correctional facility (*see* Correction Law §§ 168-c, 168-f [1] [a], 168-m). Additionally, an offender's duty to register is triggered "at least [10] calendar days prior to [, inter alia,] . . . release from any state or local correctional facility, hospital or institution where he or she was confined or committed" (§ 168-f [1] [a]). SORA also imposes a duty on DOCCS, inter alia, to notify the division of criminal justice services (DCJS) "at least [10] calendar days prior to the release or discharge of any sex offender from a correctional facility, hospital or local correctional facility . . . of the contemplated release or discharge of such sex offender" (§ 168-c [1]). Notably, the very *start* of the SORA process is activated by those expressly

listed locations—specifically "any state or local correctional facility, hospital or institution"—based on their individual duty to send relevant information about the offender to the Board, which must occur at least 120 days prior to "release or discharge" from each institution, in this case DOCCS (§ 168-m).

Contrary to the assertion of defendants, nowhere in the statute does SORA require delaying a risk level classification hearing or a final SORA adjudication until an offender's reentry into the community is assured, and we decline to read those words into the statute (*see American Tr. Ins. Co. v Sartor*, 3 NY3d 71, 76 [2004] ["A court cannot amend a statute by adding words that are not there"]). Although the "release" of a sex offender from confinement by DOCCS most often coincides with reentry into the community, there is nothing in the statute expressly limiting the term to that event. Indeed, by listing the specific facilities, release from which triggers various SORA obligations, rather than simply stating that "release into the community" does so, the legislature made clear its intent. To conclude otherwise would effectively amend the statute by striking the listed facilities and substituting "into the community" as the SORA-triggering event. This we may not do (*see generally* McKinney's Cons Laws of NY, Book 1, Statutes §§ 94, 97). In fact, none of the statutory language identified above would be necessary if the only meaning of "release" was reentry of the offender into the community, free from any and all state confinement.

SORA's overarching structure bolsters our interpretation of the text (*see generally* McKinney's Cons Laws of NY, Book 1, Statutes § 97). For example, when an offender is civilly committed under SOMTA, Correction Law § 168-f (2) (c-1) and (3) suspend certain

SORA registration requirements, thereby demonstrating that the legislature envisioned that

civilly committed offenders would already have SORA risk level classifications at the time

they are placed in a secure treatment facility. Further, Article 8 of the Correction Law,

which concerns community supervision, ties the term "release" to a person's release from

confinement by DOCCS, not merely their release into the community (*see e.g.* §§ 203, 205-

206).[5]

SORA plainly envisions a singular process, one that is triggered 120 days prior to

an offender's release from confinement by DOCCS (*see* § 168-m), continuing through a

classification hearing held 30 days prior to release (§ 168-n [2]), and concluding with the

offender's registration 10 days prior to release (§ 168-f [1] [a]). There is no indication that

the legislature intended for the term "release" to have different meanings at different stages

in the SORA process, and the artificial distinction the dissent draws between "release" for

---

[5] According to DOCCS, both defendants are listed as having been either discharged or released to another agency. Although certainly not dispositive to our interpretation of the word "release," it is nonetheless relevant that DOCCS's records show defendants as having been released, irrespective of the fact that there were ongoing proceedings under SOMTA (*see* Correction Law § 72 [1] [DOCCS has the charge to confine persons in its institutions "until paroled, conditionally released, transferred to the care of another agency, or released or discharged in accordance with the law"]). Contrary to the dissent's view (*see* dissenting op at 7-8), Correction Law § 72 (1) does not distinguish "release," "discharge," or "transfer" from one another. Instead, it simply outlines DOCCS's duty to confine individuals and specifies when that duty ceases. Indeed, we note that DOCCS's Community Supervision Handbook lists the nine ways an inmate may be released from prison, none of which involve transfer to a secure treatment facility under SOMTA (New York State Department of Corrections and Community Supervision, Community Supervision Handbook at 5, available at https://doccs.ny.gov/system/files/documents/2019/05/Community_Supervion_Handbook.pdf [last accessed Feb. 19, 2020]).

registration/classification purposes and risk level determination purposes is wholly

unsupportable (*see* dissenting op at 14-17).

C.

In addition to SORA's text and structure, we also reject defendants' preferred

construction of the term "release" because it would be contrary to the legislature's intent

when it enacted SORA and would render the act practically unworkable. The legislature's

paramount concern when it enacted SORA was "to protect the public from the danger of

recidivism posed by sex offenders, to assist the criminal justice system to identify,

investigate, apprehend and prosecute sex offenders, and to comply with the Federal Crime

Control Act" (*Stevens*, 91 NY2d at 275 [internal quotation marks omitted]; *see also Doe

v Pataki*, 120 F3d 1263, 1266 [2d Cir 1997] [indicating that the twin purposes served by

SORA are "(1) protecting members of the community, particularly their children, by

notifying them of the presence of individuals in their midst who may present a danger, and

(2) enhancing law enforcement authorities' ability to investigate and prosecute future sex

crimes"]). To effectuate that purpose, SORA establishes registration and notification

requirements for sex offenders and creates a three-tier classification system based on their

risk of reoffending, with level one being the lowest risk and level three being the highest

risk (*see* Correction Law § 168-l [6]; *People v Diack*, 24 NY3d 674, 680 [2015]). The

dissent's construction of "release" under SORA undermines this goal by exposing the

public to the risk the statute was enacted to protect against (L 1995, ch 192, § 1).

When an offender is discharged or released from civil confinement under SOMTA,

notice is given only to the Attorney General and the offender (*see* Mental Hygiene Law §

10.09 [e]).  In contrast, under SORA, when an offender is to be released the statute clearly requires that certain parties are timely and properly notified about the impending risk level adjudication—i.e., the Board, the sentencing court, and the district attorney (*see e.g.* Correction Law §§ 168-l [6], 168-n [3]).  SOMTA does not require OMH to give notice of an offender's release from civil confinement to *any* of the parties listed above.  Thus, if we accepted defendants' contention that an offender is not released whenever SOMTA proceedings are pending or contemplated, there would be no statutory guidance as to how, precisely, the mechanism of SORA would be triggered if and when an offender is released from civil confinement.[6]  SOMTA does not address that serious notice problem because it never arises:  a SORA risk assessment must have occurred by the time of an offender's release from incarceration—i.e., *before* any determination is made under SOMTA.

---

[6] It is true enough that the Correction Law requires a hospital—now also defined to include a secure treatment facility under Mental Hygiene Law § 10.03 (*see* Correction Law § 168-a [6])—to "forward relevant information pertaining to a sex offender to be discharged, paroled, released" to the Board (§ 168-m), arguably triggering its duties under SORA. Despite making that definitional change when SOMTA was originally adopted in 2007 (*see* L 2007, ch 7, §§ 2, 10), the legislature did not otherwise see fit to alter the strict timeline for judicial action under SORA.  Instead, SOMTA's bill jacket states that the legislature expanded Correction Law § 168-a (6)'s definition of the word "hospital" merely for the purpose of "requir[ing] secure treatment facility[ies] to notify DCJS of an offender's imminent release" (Governor's Program Bill Mem No. 8 at 2, Bill Jacket, L 2007, ch 7). Certainly, had the legislature intended to *require* courts to delay all SORA risk level classification of an offender during the pendency of any SOMTA proceedings and ensuing civil confinement to a secure treatment facility, it easily could have done so (*see Matter of Corrigan v New York State Off. of Children & Family Servs.*, 28 NY3d 636, 642 [2017] ["the failure of the (l)egislature to include a substantive, significant prescription in a statute is a strong indication that its exclusion was intended" (internal quotation marks and citations omitted)]).

Indeed, the record in each case here demonstrates the impracticality of defendants' proffered interpretation of the term "release." At the time of defendants' respective SORA hearings—the relevant time for our purposes—no final judicial determination had yet been made as to whether they qualified for civil commitment under SORA. Indeed, at the time of the SORA hearing in Cotto's case, no SOMTA petition had been filed, and Cotto had not been transferred to OMH's care. He had merely been notified that his case had been referred to the case review team to ascertain whether civil commitment proceedings were warranted (*see* Mental Hygiene Law § 10.05). Even if the case review team concluded that further proceedings under SOMTA should occur, that determination would still be reviewed by the Attorney General, who would be responsible for determining whether to file a civil confinement petition under SOMTA (*see* § 10.06 [a]). Put simply, there was no certainty at the time of their SORA hearings, that either defendant—both ultimately classified as the highest-risk offenders—would be confined for any significant period beyond their "release" from incarceration.[7] Given the lack of a predictable release date under SOMTA, the Board, the sentencing court, the district attorney's office, and the secure treatment facility would likely find it impossible to coordinate and comply with SORA's statutory obligations if release only meant reentry into the community. Inevitably this would result in the release into the community of recidivist sex offenders who lacked any

---

[7] That was particularly true of Cotto because, at the time of the SORA hearing, he was scheduled to be released from confinement by DOCCS upon the maximum expiration of his sentence.

risk level classification—the precise risk SORA aims to address (*see Diack*, 24 NY3d at 680).

We cannot conclude that the legislature would accept such a risk. Rather, the approach more consistent with SORA—and indeed, the only practical approach—is for the sentencing court to conduct a SORA risk level classification hearing when the offender is released from confinement by DOCCS, irrespective of any parallel process occurring pursuant to SOMTA. In short, delaying defendants' SORA adjudication here would serve only to impede SORA's purpose of "protect[ing] the public from the danger of recidivism posed by sex offenders" (*Stevens*, 91 NY2d at 276; *see People v Mingo*, 12 NY3d 563, 574 [2009]). The defendants' preferred approach would create a situation where, due to uncertainty over whether the state will successfully pursue SOMTA proceedings, an offender might reenter the community without a risk level determination because DOCCS may no longer confine the individual legally.

D.

Nor do we find persuasive the dissent's arguments in support of defendants' interpretation of the term "release." The dissent construes the term "release" as meaning an offender's release from incarceration by DOCCS *unless* the offender may be transferred to another type of state custody. It generally supports that interpretation through a narrow focus on one isolated SORA provision, a resort to dictionary definitions, and a refusal to acknowledge the serious public safety risks inherent in its approach.

The dissent, with the benefit of hindsight, says that of course no "release" has occurred here because defendants have remained confined by the state at all relevant times

(*see* dissenting op at 2). However, at the time Supreme Court made the determinations challenged on appeal, it did not have the luxury of knowing that defendants would remain in state confinement, and was faced with the possibility that, in delaying the SORA hearing until after their time of DOCCS confinement had ended, defendants could be released into the community without a risk level classification. The dissent's approach does not grapple with the situation that Supreme Court faced when it was called upon to make the challenged SORA determinations. These cases show precisely why the only workable, consistent, and predictable approach is to conclude that "release" occurs for SORA purposes when the offender's confinement by DOCCS will cease.

Moreover, the risks labeled by the dissent as "mundane operational concerns" (dissenting op at 17) are precisely the risks to the community that the legislature sought to address through enactment of SORA. Here, those concerns relate to the classification of "the most dangerous *recidivist* sex offenders" (*id.* [internal quotation marks omitted]), including those who, like defendants, have repeatedly sexually victimized young children. The risk here is not simply that agencies and courts will find it confusing or challenging to comply with the SORA process, but that vulnerable members of the community will lack the safeguards provided by SORA when offenders are released without proper classification and oversight. The idea that the legislature left it up to the assortment of officials involved in the administration of SORA and SOMTA to cooperate on an ad hoc basis to develop procedures for handling the classification of SOMTA offenders is entirely inconsistent with SORA's goal of protecting the community.

In light of our conclusion that "release" under SORA encompasses release from DOCCS's confinement—and not merely release into the community—Supreme Court properly concluded that the SORA hearings in each case were not premature due to pending or potentially pending SOMTA proceedings. In fact, conducting the SORA hearings at their respective times was precisely what the statutory scheme intended.

III.

Defendants further contend that by conducting their SORA hearings at a time when they were unlikely to be released into the community, they were denied due process because they could not challenge their risk level classification at a meaningful time. We also reject that contention.

The United States and New York Constitutions require that the state not deprive an individual "of life, liberty, or property, without due process of law" (US Const, Amend XIV, § 1; NY Const, art I, § 6). "The bedrock of due process is notice and opportunity to be heard" (*see People v David W.*, 95 NY2d 130, 138 [2000], citing *Mathews v Eldridge*, 424 US 319, 333 [1976]). Nonetheless, due process is a flexible concept that

> "generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved in the fiscal and administrative burdens that the additional or substitute procedural requirement would entail" (*Mathews*, 424 US at 335; *see David W.*, 95 NY2d at 136-137).

As relevant to these appeals, "[i]t is well established that sex offenders are entitled to certain due process protections at their risk level classification proceedings" (*People v*

*Baxin*, 26 NY3d 6, 10 [2015]; *see David W.*, 95 NY2d at 140; *see also Doe v Pataki*, 3 F Supp 2d 456, 469-470 [SD NY 1998]).  In particular, "[d]ue process requires that the State bear the burden of proving, at some *meaningful time*, that a defendant deserves the classification assigned" (*David W.*, 95 NY2d at 140 [emphasis added]).  Generally speaking, an opportunity to be heard at a meaningful time means that a defendant has the ability to challenge the determination *before* the state makes its determination (*see Kaur v New York State Urban Dev. Corp.*, 15 NY3d 235, 260 [2010]; *see generally Goldberg v Kelly*, 397 US 254, 268 [1970]; *Armstrong v Manzo*, 380 US 545, 550-551 [1965]).

Although classification as a level three offender impacts private liberty interests (*see David W.*, 95 NY2d at 138), we nonetheless conclude that determining the risk level of a sex offender upon the offender's release from confinement by DOCCS—even if that offender is potentially subject to indefinite civil commitment under SOMTA—presents minimal risk of misclassification and thus minimal risk of an erroneous deprivation of those interests (*see generally Mathews*, 424 US at 335; *Matter of K.L.*, 1 NY3d 362, 373 [2004]; *Pringle v Wolf*, 88 NY2d 426, 434 [1996]).  SORA already provides substantial procedural safeguards to offenders when making a risk level classification (*see e.g.* Correction Law §§ 168-n [3] [providing for notice of the risk level classification hearing, disclosure of the Board's recommendation, assigned counsel, submission of evidence by the offender, and placing the burden of proving the facts supporting the risk level assessment on the People]; 168-o [2] [providing the offender with the option of pursuing yearly modification hearings]).  In addition, SORA provides an offender with the opportunity to challenge a risk level classification at a time *before* a determination is made by the Board or the

sentencing court (*see* §§ 168-m [offender is permitted to submit to the Board any information relevant to review]; 168-n [3]; *see generally Goldberg*, 397 US at 268; *Pringle*, 88 NY2d at 434). These procedural safeguards were implemented specifically to mitigate the risk of an erroneous deprivation (*see Doe*, 3 F Supp 2d at 470-472).

There is little reason to believe that a sex offender considered for civil management under SOMTA who has been afforded these procedural safeguards has been misclassified under SORA as a level three offender. Sex offenders in need of civil management under SOMTA are among the highest risk offenders in the system (*see* Mental Hygiene Law §§ 10.01 [b]; 10.03 [i], [q]). Indeed, most of the relevant RAI factors in defendants' respective cases are based on the unalterable characteristics of the underlying offenses, as well as on each offender's criminal history—both of which involved repeated sex crimes against young children and, as such, subjected these defendants to automatic overrides (*see* Correction Law § 168-l [5]). None of these RAI factors, nor the application of the automatic override, will change during any period of civil confinement, and consequently the risk of misclassification at an arguably "premature" hearing is minimal.

The state's interest also cuts against postponing the initial SORA hearing until an offender will be released into the community (*see generally Mathews*, 319 US at 335). To that end, the state has an important interest in ensuring that all sex offenders receive proper risk level classifications before they reenter the community. As discussed above, because the timing of release from civil commitment can be unpredictable and may not allow the parties to comply with the statutorily mandated timeframe expeditiously, delaying the SORA hearing could result in the release of sex offenders into the community without the

proper risk level classification. The state has a significant interest in avoiding that result, especially given the pool of offenders subject to SOMTA proceedings. This is particularly important given the public safety objectives served by SORA (*see generally Mingo*, 12 NY3d at 574; *Stevens*, 91 NY2d at 276).[8] Thus, in light of the minimal risk to defendants occasioned by conducting a SORA hearing despite the potential pendency of SOMTA proceedings, and given the state's strong interest in ensuring predictable and timely risk level adjudications, defendants were not denied due process when their risk level classification hearings were held upon their release from confinement by DOCCS.

Accordingly, in each case, the Appellate Division order should be affirmed, without costs.

---

[8] Indeed, providing the community and law enforcement notice about recidivist child sex offenders like the defendants in these appeals clearly fulfills the purposes behind the legislature's enactment of SORA (*see* L 1995, ch 192, § 1).

WILSON, Chief Judge (dissenting):

Mr. Boone and Mr. Cotto are sex offenders who served their prison terms and have been determined, pursuant to the Sex Offender Management and Treatment Act (SOMTA) (Mental Hygiene Law § 10.01 *et seq.*), to be dangerous sex offenders incapable of controlling their sexual offending.

Prior to those determinations, Mr. Boone and Mr. Cotto were incarcerated in the custody of the Department of Corrections and Community Supervision (DOCCS), serving

- 1 -

prison sentences for committing sex offenses.  Both of them were transferred from prison to a secure treatment facility operated by the Office of Mental Health (OMH) where they remain to date and for the indefinite future.[1]  Thus, from the moment of their convictions to the present, they both been confined in state custody.

The question on this appeal is whether they have been "released" within the meaning of section 168-n of the Sex Offender Registration Act (SORA) (Correction Law § 168 *et seq.*).  The sole practical consequence is whether their risk to the public should be determined when they were transferred from DOCCS custody to OMH custody – after which they may remain locked up perhaps for decades or a lifetime – or shortly before they are no longer locked up by the state and released into the public, albeit usually under the strict and intensive supervision required when such persons appear to have been rehabilitated to some degree (*see* Mental Hygiene Law § 10.11).

---

[1] Although Mr. Boone's Article 10 proceedings were still ongoing at the time of his conditional release date from DOCCS custody, he remained confined in State custody, having been transferred directly from a DOCCS facility to an OMH-operated secure treatment facility prior to his SORA proceeding.  At his SORA proceeding which was held four months after his conditional release date, Mr. Boone appeared by video conference from the secure treatment facility.  Mr. Boone has been confined in State custody continuously since at least the date of his original commitment to DOCCS, April 5, 2011.

Mr. Cotto was informed by a DOCCS letter on January 14, 2016, 46 days prior the date of the maximum expiration of his prison sentence, that he might be subject to commitment under SOMTA.  The SORA court denied Mr. Cotto's request to adjourn his SORA proceeding pending the outcome of his SOMTA proceeding.  The DOCCS website indicates that Mr. Cotto was remitted back to DOCCS custody on February 29, 2016, on his maximum release date, and remained in DOCCS custody for over two years thereafter, pending the duration of his SOMTA proceedings until he was adjudicated in need of civil confinement and transferred to an OMH-operated secure treatment facility.  Mr. Cotto has remained confined in State custody continuously since at least the date of his original commitment to DOCCS, September 19, 2006.

In common parlance, someone locked up by the state is not "released," regardless of which arm of the state is responsible for the confinement.  The majority, however, insists that the meaning of "release" in section 168-n, is determined by the "plain reading of SORA" (majority op at 9, 2).

Its analysis begins with the language at issue, section 168-n's use of the word "release," and acknowledges that SORA does not define "release."  The majority's plain reading, however, takes several pages to explain, and points not to any plain language, but rather to a hodgepodge of inferences drawn from the Correction Law, Mental Hygiene Law and from sound bites from cases that have nothing to do with what "release" means (*see* majority op at 9-13, citing §§ 72 [1]; 168-a;168-c [1]; 168-f [1] [a], [2] [c-1], [3]; 168-m; l68-*l* [6], [8]; 168-n [2]-[1] [3]; 203; 205-206) and from the Mental Hygiene Law (*see id.*, citing §§ 10.03 [m]; 10.05; 10.06 [a]; 10.09 [e]).[2]  There is nothing plain about the majority's construction of the statutory language.

## I.

Under the plain language of SORA, neither Mr. Boone nor Mr. Cotto has been released.  As the majority acknowledges, our paramount concern when interpreting a statute is to give effect to the legislature's intent, which is best expressed by the statute's own language if clear (majority op at 7-8).  *Majewski v Broadalbin-Perth Central School*

---

[2] For example, the italicized quote from *People v Stevens* (91 NY2d 270, 272 [1998]) is taken from a case in which the sole question was whether, as to persons who had been sentenced before SORA was enacted, they could take an appeal under the Criminal Procedure Law from their SORA determination.  The defendants in *Stevens* had been released from DOCCS incarceration before SORA was enacted, and were never confined pursuant to SOMTA, which did not exist at the time.

*District* (91 NY2d 577 [1998]), on which the majority relies, further explains that "[i]n

construing statutes, it is a well-established rule that resort must be had to the natural

signification of the words employed, and if they have a definite meaning, which involves

no absurdity or contradiction, there is no room for construction and courts have no right to

add to or take away from that meaning" (*id.* at 583 [internal citation and quotation marks

omitted]).

> "1. A determination that an offender is a sexual predator,
> sexually violent offender, or predicate sex offender . . . shall be
> made prior to the discharge, parole, release to post-release
> supervision or *release* of such offender by the sentencing court
> . . . after receiving a recommendation from the board [of
> examiners of sex offenders] [the Board]. . .
>
> 2. In addition . . . the sentencing court shall also make a
> determination with respect to the level of notification after
> receiving a recommendation from the [Board] . . . . Both
> determinations of the sentencing court shall be made thirty
> calendar days prior to discharge, parole or *release*" (Correction
> Law § 168-n [1]-[2] [emphases added]).

In relevant part, SORA provides:

Correction Law § 168-n does not identify a custodian from whose release triggers a

risk determination. That absence, coupled with the breadth of the language, indicates that

the legislature did not care *who* was releasing the sex offender; the triggering event was

"discharge, parole or release" from any sort of custody. "Where a statute describes the

particular situations in which it is to apply, and no qualifying exception is added 'an

irrefutable inference must be drawn that what is omitted or not included was intended to

be omitted or excluded'" (*Matter of Alonzo M. v New York City Dept. of Probation*, 72

NY2d 662, 665 [1988], quoting *Patrolmen's Benevolent Assn. of City of New York v City*

*of New York*, 41 NY2d 205, 208 [1976]).  By defining "release" as "an offender's release from confinement by DOCCS" (majority op at 9), the majority engrafts "by DOCCS" where it is conspicuously absent from the statute.

Here, as the majority acknowledges, SORA "does not expressly define the term 'release'" (majority op at 9).  Likewise, neither the majority nor the parties contends that there is some specialized definition of "release" in the field of sex offender management. In such circumstances, we interpret words by resort to their "natural and ordinary meaning" (*Matter of Kamhi v Planning Bd. of Town of Yorktown*, 59 NY2d 385, 391 [1983]).

 "Release" is defined as "[t]he action of freeing or the fact of being freed from restraint or confinement" (Black's Law Dictionary [11th ed 2019, release]), and "confinement" refers to the "act of imprisoning or restraining someone; the quality, state, or condition of being imprisoned or restrained" (*id.*, confinement) (*cf. Matter of Grand Jury Subpoena Duces Tecum Served on Museum of Modern Art*, 93 NY2d 729, 738 [1999]).

Mr. Boone and Mr. Cotto have never been set free from confinement.  They, like all other persons confined pursuant to SOMTA, are held in secure treatment facilities in which they are segregated from the general community and subject to extreme restraints on movement and liberty functionally analogous to those imposed upon individuals incarcerated in correctional facilities.  They cannot leave the secure treatment facility except for a few enumerated events, and then only with permission from the facility's administrator and under constant supervision (*compare e.g.*, Mental Hygiene Law § 10.10 [f] [a person committed to a secure treatment facility may "be granted an escorted privilege

by the director of the secure treatment facility . . . but only for the purposes of allowing the person to receive medical or dental care or treatment not available at the facility, to visit a family member who is seriously ill or to attend the funeral of a family member.  A person granted an escorted privilege shall be under the constant supervision of one or more facility employees"] *with* 7 NYCRR 1900.3 [a] [describing DOCCS's similar "Leave of Absence" program for the general prison population]; *see also State v Nelson D.*, 22 NY3d 233, 239-40 [2013] [characterizing the restraints on liberty imposed under SOMTA confinement]).

As part of its plain language argument, the majority cites to select language in Correction Law §§ 168-c (1) and 168-f (1) (a) as evidence that "release" refers to release from confinement by DOCCS (*see* majority op at 10).  However, only one of those provisions, Correction Law § 168-c, references DOCCS, and both of those provisions explicitly obligate a "hospital" to notify the DCJS when a sex offender is about to be released.  When it passed SOMTA, the legislature amended the definition of "hospital" in SORA to incorporate secure detention facilities in which individuals committed under SOMTA were confined (*see* L 2007, ch 7 at 21), in recognition of the fact that following its passage, sometimes sex offenders would be released to the community from secure psychiatric facilities, not prison.  The fact that the notification obligation is parallel for DOCCS and hospitals suggests that "release" relates to release from all State custody.  It surely provides no basis for concluding that the term "release" in Correction Law § 168-n should be read to apply to transfer from DOCCS custody to OMH custody.

The majority also quotes Correction Law § 72 (1) to support its position, arguing as follows:

> "[I]t is . . . relevant that DOCCS's records show defendants having been released, irrespective of the fact that there were ongoing proceedings under SOMTA (*see* Correction Law § 72 [1] [DOCCS has the charge to confine persons in its institutions "until paroled, conditionally released, *transferred to the care of another agency*, or released or discharged in accordance with the law" (emphasis added)]). " (majority op at 11 n 5).

But that language supports precisely the opposite conclusion: Correction law § 72 (1) distinguishes between "released or discharged" on the one hand, and "transferred to the care of another agency" on the other. As regarding the interpretation of "release" in SORA's § 168-n, then, the Correction Law considers transfer to another agency to be something different from "release." Mr. Cotto and Mr. Boone were, in fact, transferred to another agency, not released.

Resorting to canons of construction, the majority notes that "where the same word or phrase is used in different parts of a statute [,] it will be presumed to be used in the same sense throughout, absent any indication of contrary intent" (majority op at 9 [internal quotation marks omitted]). I have no quarrel with that maxim, but it does not support the majority's claim that "release" applies to a transfer of confinement from one state lockup to another. The majority refers not to § 168-n, but instead to "multiple SORA provisions [that] expressly tie the concept of 'release' to an offender's departure from *any of several* expressly listed locations, including – first and foremost – a correctional facility" (majority op at 9 [emphasis in majority]). From that, the majority contends that "release" in § 168-n must have the same meaning as in the sections that enumerate the places from which a

defendant's release triggers some different SORA obligation, not the risk-level determination.

There are several problems with that argument. First, in some portions of SORA the legislature paired "release" with specific locations, but in others – including § 168-n, it did not. Thus, contrary to the majority's conclusion, although the same word "release" is used in several places, the legislature used a different phrase in § 168-n, one that omits any reference to the place from which the person is released, which under the majority's maxim suggests that we should treat the different choice of words differently.

Second, the majority's interpretation – that "release" includes a transfer of custody from one state lockup to another – would produce absurd results. SORA defines "hospital" to include the secure psychiatric facilities of the sort that Mr. Cotto and Mr. Boone are held in, but also "a hospital as defined in subdivision two of section four hundred" of the Correction Law (Correction Law § 168-a), and Section 400 in turn defines "hospital" as "a hospital in the department of mental hygiene which is designated as such by the commissioner of mental hygiene for the care and treatment of mentally ill incarcerated individuals" (*id.* at § 400 [2]). Apart from the two secure psychiatric facilities that house dangerous sex offenders, New York has two dozen other state-run hospitals for the treatment of mentally ill persons (*see* Office of Mental Health, Directory of OMH Facilities, https://omh.ny.gov/omhweb/aboutomh/omh_facility.html [last accessed Feb. 15, 2024]). If, for example, a person previously convicted of a sex offense was arrested and sent by a court to such a facility for a competency hearing, the transfer of that person back to pretrial detention, or to a different mental hospital for longer-term care, would

constitute a "release" under the majority's interpretation, requiring a SORA risk-level determination each time such a transfer occurred.[3]

In common parlance, no one would conclude that Mr. Cotto or Mr. Boone has been released. At the point, if ever, that their release from a secure treatment facility is imminent, SORA requires that a risk-level determination must be made.

## II.

Even were one to conclude that SORA is unclear as to what "release" means, one would then turn to the legislative history. In interpreting any statute, it is "fundamental that a court . . . should attempt to effectuate the intent of the Legislature" (*Patrolmen's Benevolent Assn. of City of New York*, 41 NY2d at 208; *see also People v Roberts*, 31 NY3d 406, 418 [2018]). "[D]ifferent acts which are *in pari materia* are to be construed in the light of each other" (McKinney's Cons Laws of NY, Book 1, Statutes §97; *see also id.* § 223). Reading them together, the legislative histories of both SORA and SOMTA reveal that the legislature contemplated confinement under SOMTA as an extension of the confinement of incarceration, and that performing a risk determination during the pendency (or potential pendency) of SOMTA proceedings runs counter to the purpose of SORA's risk-level determination process.

---

[3] For that reason, the majority is mistaken when it asserts "none of the statutory language identified above would be necessary if the only meaning of 'release' was reentry of the offender into the community, free from any and all state confinement" (majority op at 10). That language is essential to ensure, for example, that when a sex offender is released on bail or released from a medical (non-psychiatric) hospital at the completion of surgery, a SORA hearing is not required. The statutorily enumerated facilities are the only ones from which release to the community would possibly trigger a SORA risk-level determination.

I completely agree with the majority that the legislature passed SORA in 1995 with the dual purpose of protecting community members by notifying them of the presence of persons convicted of sex offenses in their community and facilitating the efforts of local law enforcement to monitor individuals convicted of sex offenses located with their jurisdictions (*see* Introducer's Mem in Support, Bill Jacket, L 1995, ch 192 at 7 ["This proposal will not only provide law enforcement with a valuable investigative tool in the fight against child abductions and sex crimes, but it also provides important information to communities since sex offenders pose a high risk of reoffending *once released from custody*"] [emphasis added]).  Specifically, the legislature intended SORA's notification and registration provisions to mitigate the risk of recidivism posed by individuals convicted of sex offenses upon "reentering the community" (*id.* at 6).  As we have often noted, SORA's purpose is "the protection of the community against people who have shown themselves capable of committing sex crimes" (*People v Knox*, 12 NY3d 60, 67 [2009]; *see also People v Cook*, 29 NY3d 121, 125 [2017]).

In 2007, the legislature passed SOMTA in order to provide a means of continuing to confine certain individuals convicted of sex crimes "whose *confinement should continue beyond the expiration of their prison terms*" (Mem, Bill Jacket, L 2007, ch 7 at 19 [emphasis added]).  SOMTA also amended SORA to include "secure treatment facilities" in the definition of "hospital" (*see* L 2007 ch 7 [amending Correction Law § 168-a to include in the definition of hospital "a secure treatment facility as defined in [SOMTA]" and "to appl[y] to persons committed to such facility by an order made pursuant to [SOMTA]"]).  A further important purpose of SOMTA is to treat dangerous sex offenders

and reduce the likelihood of reoffending, so that those responding well to treatment could eventually be returned to the community (*see, e.g.,* Mental Hygiene Law § 10.01 [c], [f] ["The goal of a comprehensive system should be to protect the public, reduce recidivism, and ensure offenders have access to proper treatment. . . . (T)he system should offer meaningful forms of treatment to sex offenders in all criminal and civil phases, including during incarceration, civil commitment, and outpatient supervision"]; Mem, Bill Jacket, L 2007 ch 7 at 10 ["The highest risk sex criminals are the ones who should be confined until they can develop the ability to control their own behavior"]).

With the passage of both SORA and SOMTA, the legislature shared a common goal: protect the community at large from the risk of recidivism posed by individuals convicted of sex offenses. Performing a risk determination on an individual who will not soon be released into the community, and whose registration obligations will be suspended until the end of his or her civil confinement does not advance SORA's objective of promulgating timely information to assist law enforcement and members of the community to protect themselves.

More importantly, making a risk-level determination many years or decades before a sex offender is actually released to the public does not measure the actual risk posed by the offender at the time of release and is antithetical to the SORA Guidelines' emphasis on the use of the best evidence available near the time of release to the community when measuring risk.[4] As we have emphasized, "the purpose underlying SORA [is] to protect

---

[4] *See, e.g.*, Sex Offender Registration Act: Risk Assessment Guidelines and Commentary (SORA Guidelines) at 15-16 (2006) ("In scoring [Risk Factor 12, Acceptance of

the public from sex offenders. Given the significance of this mission, an accurate determination of the risk a sex offender poses to the public is the paramount concern." (*People v Mingo*, 12 NY3d 563, 574 [2009]). Making a risk-level determination for someone who remains locked indefinitely in state custody does not serve SORA's purpose; making that determination years or decades before someone's release to the community flouts SORA's objective of "an accurate determination of the risk."

Making a risk-level determination years or decades before the actual release of a sex offender into the community is also inconsistent with SOMTA's purpose of treating and successfully deinstitutionalizing sex offenders. As OMH has explained, for those confined under Article 10, "[t]reatment services are individualized and strength-based, with the intended outcome of reducing the residents' risks of sexually re-offending, while promoting growth in key areas such as treatment engagement, self-regulation, managing sexual deviance, and developing pro-social attitudes and behavior" (New York State Office of Mental Health, *2022 Annual Report on the Implementation of Mental Hygiene Law Article 10, Sex Offender Management and Treatment Act* [2022 OMH Report] [Nov. 2022]

---

Responsibility], the Board or court should examine the offender's most recent credible statements and should seek evidence of genuine acceptance of responsibility. . . . The guidelines add five points if the offender has refused or been expelled from treatment since such conduct is powerful evidence of the offender's continued denial and his unwillingness to alter his behavior. If an offender who has historically not accepted responsibility and historically has refused sex offender treatment but, subsequently participates in such programming, the Board or court should seek to examine whether there is evidence of a genuine acceptance of responsibility"); *id.* at 15 ([Risk Factor 13, Conduct While Confined or Under Supervision] "looks to the offender's conduct while in custody or under supervision as a predictor of future behavior"); *id.* at 19 (when an offender makes a threat to reoffend by committing a sexual or violent crime: "if the threat is recent enough that there is cause to believe that the offender may act upon it, an override is warranted").

at 6, available at https://omh.ny.gov/omhweb/statistics/somta-report-2022.pdf [last accessed Jan. 30, 2024]).

Mr. Cotto and Mr. Boone are the paradigmatic offenders contemplated for civil confinement under SOMTA. As the majority observes, each appellant had been convicted of serious offenses prior to their instant convictions and had preexisting risk-level determinations even before their most recent convictions. From those facts, the majority concludes that SORA is "practically unworkable in cases involving the highest risk offenders" (majority op at 7). The exact opposite is true; these are the offenders most likely to be subject to intensive monitoring because the number of offenders to whom SOMTA applies is quite small and, given the severity and recidivistic nature of their offenses, they are likely to already be under some form of government supervision.

### III.

The majority's plain-language argument is really something quite different: it is a collection of observations about ways in which other parts of SORA and SOMTA could be read to create various hypothesized gaps if the SORA risk-level determination were to be made close in time to the release of a sex offender from all physical confinement by the State. However, the various statutory provisions are written in such a way as to avoid any of those hypothetical gaps, and even were they not, the existence of the gaps would not mean that the plain definition of "release" produces an absurd result (*cf. Lubonty v U.S. Bank N.A.*, 34 NY3d 250, 255-257 [2019]).

### A.

The majority's principal claimed incongruity it uses to support its decision is that the risk-level determination and registration requirements must be simultaneously determined because the language of certain SORA provisions tie the concept of an individual's release to one of a number of "expressly listed locations" and because the timing of the registration obligations is tied to the date of an individual's release from one such location (as opposed to release into the community) (majority op at 9-10).

However, the majority's reading relies on a misapprehension about SORA's structure and mischaracterization of that statute's language. The provisions of SORA pertaining to the timing of an individual's risk determination are treated separately from those provisions pertaining to the timing of an individual's registration obligations, and the majority errs in reading a condition into the statute where the legislature intentionally did not include one (*see Matter of Alonzo M.*, 72 NY2d at 665 ["Where a statute describes the particular situations in which it is to apply, and no qualifying exception is added an irrefutable inference must be drawn that what is omitted or not included was *intended* to be omitted or excluded"] [emphasis added] [citation and internal quotation marks omitted]; *Matter of Albano v Kirby*, 36 NY2d 526, 530 [1975] ["When different terms are used in various parts of a statute or rule, it is reasonable to assume that a distinction between them is intended"]).

As the majority notes, the SORA provisions pertaining to the timing of an individual's registration obligations are explicitly tied to an individual's release or discharge from an enumerated location (*see* majority op at 10-11). In contrast, SORA's provisions pertaining to the timing of the risk-level determination are *not* tied to release

from an enumerated location (*see id.* §§ 168-*l* [6] ["(T)he (B)oard shall within sixty calendar days prior to the discharge, parole, release to post-release supervision or release of a sex offender make a recommendation"]; 168-m ["(A)ny state or local correctional facility, hospital or institution, district attorney, law enforcement agency, probation department, state board of parole, court or child protective agency shall forward relevant information pertaining to a sex offender to be discharged, paroled, released to post-release supervision or released to the (Board) for review no later than one hundred twenty days prior to the release or discharge and the (Board) shall make recommendations as provided in (§ 168-*l* [6]) within sixty days of receipt of the information"]).[5]

That distinction in timing makes sense, because the registration requirement and classification (sex offender, sexual predator, sexually violent offender, predicate sex offender) are determined by the crime(s) of conviction and prior criminal history, which are known at the time of conviction and are immutable. Had the legislature not intended for the risk-level determination to take into account dynamic factors when assessing an offender's risk to the public, it could have required the determination to occur at the time of sentencing, completely disregarding the offender's most recent state at the time of release (*see e.g. Matter of Mental Hygiene Legal Serv v Sullivan*, 32 NY3d 652, 659 [2019]

---

[5] Although Correction Law § 168-n (1)-(2) provides that both the classification of the sex offender and the risk-level determination "shall be made thirty calendar days prior to discharge, parole or release," that requirement cannot reasonably be read to require that all such determinations be made precisely on the thirtieth day, but rather that they be made no later than 30 days before release. As discussed below, nothing in SORA or SOTMA would prevent a court from imposing registration requirements upon the completion of a sentence of incarceration and determining the risk level no later than 30 days before release to the public.

[" 'the failure of the Legislature to include a substantive, significant prescription in a statute is a strong indication that its exclusion was intended' "], quoting *Matter of Corrigan v New York State Off. of Children & Family Servs.*, 28 NY3d 636, 642 [2017]). The risk-level determination, however, explicitly considers an individual's actions *after* he or she committed the offense – factors that may change over time – such as conduct during confinement (*see* SORA Guidelines, risk factor 13), participation in – or expulsion from – sex offender treatment while confined (*see id.*, risk factor 12), acceptance of responsibility (*see id.*) and factors that may warrant a downward departure (SORA Guidelines at 14 ["an offender's response to treatment, if exceptional, can be the basis for a downward departure"]). The express consideration of facts occurring during incarceration reflect the legislature's judgment that safe release to the community should include the most recent evidence available. Thus, the statutory structure supports reading "release" to mean release from all State confinement, not merely transfer of confinement from one arm of the State to another.

There is a further reason the analytical weight placed by the majority on the timing of the SORA's registration requirement is unjustified. SOMTA "was intended to 'civilly confin[e] the most dangerous *recidivistic* sex offenders'" (Mem, Bill Jacket, L 2007 ch 7 at 6 [emphasis added]). Such persons already are subject to SORA's registration requirements by virtue of their prior sex offense convictions, and the effective date of their registration requirement is necessarily disconnected from their risk-level determination, whenever it is made. Moreover, SOTMA expressly suspends certain registration obligations for individuals civilly confined under that statute, further emphasizing a

legislative determination that registration obligations and risk-level determinations are uncoupled (*see* Correction Law § 168-f [2] [c-1], [3]).

B.

The balance of the majority's observations about myriad statutory provisions do not bear on the meaning of "release," but rather amount to mundane operational concerns that can readily be addressed by the various responsible actors under the SORA and SOMTA frameworks.

From the timing provisions in SORA, the majority concludes that deferring a risk-level determination until near the time, if any, that a sex offender subjected to or threatened with commitment under SOMTA would be "practically unworkable" (majority op at 7) – an *ipse dixit* that avoids any detailed examination of how the various statutory timing requirements could be fully complied with without resulting in the release to the community of a sex offender with no risk-level determination. Tellingly, the majority does not contend that full compliance with SORA's risk-level determination process could not occur if those determinations were deferred to near in time to an individual's actual release into the community. Instead, the majority's worry is that SORA and SOMTA do not spell out detailed instructions on how the relevant governmental actors should coordinate their activities to meet various statutory requirements (majority op at 12-13). Of course, the lack of a statutory instruction manual does not disable agencies from developing procedures that allow them to fulfill their statutory duties, nor does it provide a basis for interpreting statutory language one way or the other.

In any event, the various provisions of both SORA and SOMTA do not impede the relevant governmental actors from developing fully workable procedures to determine the risk level of persons subjected to SOMTA shortly before their release into the community. Both statutes clearly contemplate sufficient communication among DOCCS, OMH, the Attorney General, and the SORA and SOMTA courts to allow all those actors to coordinate to ensure that individuals subject to SOMTA proceedings receive timely risk determinations before their release into the community.

When estimating the weight of majority's workability concern, it is important to keep in mind the tiny size of the population in question. Whereas thousands of sex offenders each year have risk level determinations made pursuant to SORA, only 59 sex offenders have been released from SOMTA commitment since the statute was enacted in 2007 – not quite four per year. As an example, in November 2022, OMH reported that of the 397 sex offenders held in New York's secure treatment facilities, only two were awaiting release, both of whom would be subject to a regime of strict and intensive supervision (SIST) upon release (*2022 OMH Report* at 5), which imposes conditions more stringent than even the highest risk-level determination under SORA.[6] Thus, even as to

---

[6] *See* New York State Division of Criminal Justice Services, *The Sex Offender Management and Treatment Act: The First Year* at 6, available at https://www.criminaljustice.ny.gov/nsor/somta_report_april2008.pdf (last accessed) ("All sex offenders on SIST are supervised by specially trained parole officers with a greatly reduced case load of 10:1. In addition, offenders are required to have six face-to-face supervision contacts and six collateral contacts each month. This allows the Officer to closely monitor the offender. Offenders are also required to abide by a set of conditions that relate to known risk factors and prior behavior. For example, these conditions may mandate that the offender cannot have contact with minors, must abide by a curfew, and cannot use a computer. Typically, individuals on SIST are monitored using GPS and must

those two, were they to be released with a risk-level determination to come later (which is counterfactual because they were being held pending release to SIST, during which time a SORA risk-level determination could be made), they would be subject to even more stringent requirements that the highest level risk determination would subject them to.

With that in mind, the relevant agencies are perfectly capable of making sure that no one slips through the cracks by developing simple and fully workable procedures. When SOMTA amended the definition of "hospital" in the Correction Law to include secure treatment facilities, it imposed the requirements of Correction Law § 168-m on those facilities too. Thus, "no later than 120 days prior to the release or discharge" of a sex offender, a "state or local correctional facility, *hospital* or institution . . . shall forward relevant information" to the Board (*id.* [emphasis added]). Of course, nothing in the statute prevents the hospital from providing that information to the Board sooner. Thus, OMH is fully equipped to time its notification and discharge proceedings to accommodate SORA's timing requirements if 120-days' notice is not sufficient. Furthermore, as to persons released to SIST, each is required to submit to the sex offender registry even before a risk-level adjudication (*see id.* at 168-h [1]), and the baseline supervision requirements under SIST exceed those of SORA risk-level 3 (*compare* Mental Hygiene Law § 10.11[2] [b] [1] ["persons ordered into a regiment of SIST . . . shall be subject to a

_____

take polygraph examinations. Offenders are also required to receive sex offender treatment and substance abuse treatment if appropriate. If an offender violates any of these conditions the parole officer is authorized to take the person into custody. At that point, the Attorney General's office can return to court and seek modification of the SIST conditions, or if appropriate, that the offender be confined").

*minimum* of six face-to-face supervision contacts and six collateral contacts per month"]
[emphasis added] *with* Correction Law § 168-f [3] [individuals designated as sexual
predators or who have received a risk-level 3 designation must verify their address in
person with the local law enforcement agency every 90 days]).[7]

As to sex offenders whose initial civil management decision under SOMTA is
pending, that statute provides mechanisms to ensure that such persons are not to be
released prior to or during the pendency of the civil commitment proceeding. DOCCS
initiates the SOMTA process. When DOCCS determines the date on which it plans to end
its incarceration of a sex offender, DOCCS notifies the Attorney General and OMH (*see*
Mental Hygiene Law § 10.05 [b]). DOCCS is expected to give that notice *at least* 120
days prior to such person's anticipated release (*id.*). If, upon preliminary screening, OMH
staff determines that the sex offender may require civil management under SOMTA, it
refers the individual to a case review team (CRT) to decide whether to recommend that
the Attorney General file a sex offender civil management petition (*id.* at [d]). Upon
referral to the CRT, the sex offender receives notice of the impending CRT review (*id.* at
[e]).

At any time after receiving written notice of a sex offender's pending release from
DOCCS and prior to the determination of the CRT, the Attorney General may file a
securing petition if it appears that such person may be released from confinement before

---

[7] Additionally, SOMTA requires that, prior to ordering an individual's release to SIST, the
court must order DOCCS to recommend supervision conditions which may include, but
are not limited to GPS tracking, polygraph monitoring and residence restrictions (Mental
Hygiene Law § 10.11 [a] [1]).

the CRT has made its determination, and if the Attorney General determines that public safety so requires (§ 10.06 [f]). The securing order requires that the sex offender remain in custody.

Within 45 days from the date on which the OMH received notice of the sex offender's release, the CRT must notify the Attorney General of its findings and whether it recommends that the Attorney General should file a sex offender civil management petition (*id.* at [g]). If the CRT determines that a sex offender requires civil management, the Attorney General may file a sex offender civil management petition, at which point the sex offender must remain confined until the court makes a determination as to whether there is probable cause to believe the sex offender requires civil management (*id.* at [h]).

If the court finds probable cause has been established to believe that the sex offender is a sex offender requiring civil management under SOMTA (either after a court hearing, or by consent of the sex offender), the sex offender must remain confined in either an OMH-administered secure treatment facility or a DOCCS facility leading up to, and during a trial which determines whether the sex offender will be committed under SOMTA (*id.* at [k]).

Although SOMTA provides that DOCCS must seek to give at least 120 days' notice to the OMH before a sex offender's anticipated release date, nothing prevents DOCCS from giving that notice with greater lead time, so that the CRT can make its determination and the court can conclude the probable cause hearing more than 120 days before the anticipated released date. In that way, if the CRT does not recommend civil

management, the SORA risk-level process can commence within the time frames set out in SORA.

There is nothing whatsoever in the record to indicate that it would be unworkable for DOCCS to give sufficient advance notice of the impending release of a sex offender to allow the CRT and probable cause determinations to be made at least 120 days before the date on which the sex offender's term of incarceration with DOCCS ends. Thus, if the CRT decided that the sex offender was not to be considered for civil management, or if the court found probable cause absent, DOCCS could notify all relevant parties of the need for a SORA hearing well in advance of the 120-day period set forth in SORA.[8]

The only remaining circumstance is one in which a sex offender prevails after a jury trial and is determined not to have a mental abnormality requiring civil sex offender management. Those situations are exceedingly rare[9] and are no different than ones in which a court vacates a risk-level determination and remits for the SORA court to conduct a new one – in the interim, the offender will be living in the community and will temporarily have no risk-level designation (*see, e.g.*, *People v Hackett*, [4th Dept 2011]). That circumstance admittedly occurs under the SORA statute in other circumstances: for

---

[8] I also note that DOCCS's failure to meet the 120-day notice provision "shall not affect the validity of such notice or any subsequent action" (MHL § 10.05 [b]).

[9] Between SOMTA's inception in April 2007 and March 2023, 84% of sex offenders who proceeded to trial were committed to State custody under SOMTA (New York State Office of the Attorney General, Sex Offender Management Bureau, *A Report On The Sex Offender Management Treatment Act April 1, 2022 to March 31, 2023*, available at https://ag.ny.gov/sites/default/files/reports/2023_somb_annual_report.pdf ([last accessed Jan. 30, 2024]). In that period, only 82 individual sex offenders who proceeded to trial were not committed to State custody under SOMTA (*id.*).

example, when an out-of-state sex offender moves to New York from another jurisdiction or when an offender is released from federal custody.

On a more basic level, it is not conceivable that DOCCS, OMH and the Attorney General cannot time their processes so that sex offenders are not released without a risk-level determination. Far from the majority's mischaracterization of the statutes' enabling legislation as "the legislature le[aving] it up to the assortment of officials involved in the administration of SORA and SOMTA to cooperate on an ad hoc basis to develop procedures" (majority op at 16), when enacting SOMTA the legislature addressed that very concern – by creating an Office of Sex Offender Management within DCJS, whose function is, in part, to "coordinate implementation of the act with other agencies" (L 2007, ch 7, Governor's Program Bill Mem No. 8 at 6), and SOMTA expressly provided that "[o]ther state agencies shall provide cooperation and assistance to the office so as to assist it in the effective performance of its duties" (L 2007, ch 7, § 3). I see no statutory provisions that would interfere with the relevant state agencies creating timetables and procedures that would defer the SORA designation until shortly before the actual termination of state custody while ensuring that persons subjected to SOMTA are released into society with a risk-level determination. The majority, apparently, has a dim view of the ability of the "assortment of officials" within the executive branch to comply with the law – a novel basis for determining the meaning of a statute.

IV.

These appeals are conceptually quite simple. The idea behind SORA's risk-level determination is to make an accurate one shortly before a sex offender is to be released, as

a way of protecting the public. A goal of SOMTA is to treat dangerous sex offenders and, for those for whom treatment works, to release them to the community, supervised. Making a risk-level determination after a decade of incarceration and before a decade of treatment serves neither purpose of those statutes. Nothing in the statutory language compels the majority's result, which is at odds with the plain language and clear statutory purposes. For that reason, I respectfully dissent.

For No. 8: Order affirmed, without costs. Opinion by Judge Curran. Judges Garcia, Singas, Cannataro and Troutman concur. Chief Judge Wilson dissents in an opinion, in which Judge Rivera concurs. Judge Halligan took no part.

For No. 9: Order affirmed, without costs. Opinion by Judge Curran. Judges Garcia, Singas, Cannataro and Troutman concur. Chief Judge Wilson dissents in an opinion, in which Judge Rivera concurs. Judge Halligan took no part.

Decided February 22, 2024